**In re Alfred A. ALLARD, Debtor.**

**Bankruptcy No. 95 B 13935.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

May 9, 1996.

Laurence H. Kallen, Foster & Kallen, Chicago, IL, for The Great Southern Company.

Richard G. Larsen, Myler, Ruddy & McTavish, Aurora, IL, for Alfred A. Allard, Debtor.

M. Scott Michel, U.S. Trustee, Chicago, IL.

Jack McCullough, Chapter 13 Trustee, Chicago, IL.

1. The Debtor testified that he would voluntarily increase the terms of his plan to 60 months in light of the amount of attorneys' fees. The credi-

*MEMORANDUM OPINION*

JOHN H. SQUIRES, Bankruptcy Judge.

This matter comes before the Court on the motion of Alfred A. Allard (the "Debtor") to avoid the lien of The Great Southern Company ("Great Southern") pursuant to 11 U.S.C. § 522(f)(1)(A) and on the objection of Great Southern to confirmation of the Debtor's Chapter 13 plan. For the reasons set forth herein, the Court hereby grants the Debtor's motion and avoids the lien of Great Southern. Further, the Court overrules the objection of Great Southern to the Debtor's plan.

## I. *JURISDICTION AND PROCEDURE*

The Court has jurisdiction to entertain these motions pursuant to 28 U.S.C. § 1334(b) and Local General Rule 2.33(A) of the United States District Court for the Northern District of Illinois. They are core proceedings under 28 U.S.C. § 157(b)(2)(K) and (L).

## II. *FACTS AND BACKGROUND*

Many of the relevant facts are not in dispute. The Debtor filed this Chapter 13 case on July 12, 1995. The Debtor listed two creditors: (1) Hamman & Benn, a law firm, in the sum of $2,252.80; and (2) Great Southern in the amount of $140,441.04. Both claims are scheduled by the Debtor on Schedule F of creditors holding unsecured nonpriority claims. The Debtor's plan proposes to pay these creditors an estimated 23% of the amount of their claims by making 48 monthly payments of $761.00 to the Chapter 13 Standing Trustee.[1] Great Southern's claim arose from the result of prior litigation.

On September 10, 1992, the Debtor was named in a lawsuit by Great Southern seeking damages for violations of the Lanham Act arising from sales of merchandise bearing trademarks owned by several rock music groups without first entering into licensing agreements. Great Southern obtained a $140,441.04 judgment solely against the Debtor in the United States District Court for the Northern District of Illinois on Janu-

tors will not receive any more than approximately 23% of their claims after payment of attorneys' fees.

ary 18, 1995. *See* Great Southern's Exhibit No. 3. On March 23, 1995, a memorandum of judgment was filed with the Recorder of Deeds of Kane County, Illinois, which established a judicial lien clouding the title upon the Debtor's residence.

On October 6, 1992, less than one month after Great Southern's lawsuit was filed, and over two years prior to the judgment being entered against the Debtor, he recorded with the Recorder of Deeds of Kane County, a quit claim deed with respect to his residence commonly known as 46W798 Main Street, Kaneville, Illinois (the "Property"). The Debtor and Sharon Allard, his wife, had previously held title as joint tenants, and reconveyed the Property to themselves as tenants by the entirety. *See* Great Southern's Exhibit No. 2. This is the Property to which the Debtor's lien avoidance motion is directed. The Debtor's schedules list his one-half interest in the Property at $120,000.

The Debtor has filed a motion to avoid Great Southern's lien pursuant to 11 U.S.C. § 522(f)(1)(A). The Debtor argues that the lien in favor of Great Southern will impair his exemptions to which he is entitled under 11 U.S.C. § 522(b)(2)(B). The Debtor maintains that under Illinois law, any property held in tenancy by the entirety may not be attached by a creditor of only one spouse.

The Debtor testified that he and his wife own in joint tenancy some vacant land in Mountain View, Missouri. The Debtor stated that he thinks his one-half interest in the property would be worth approximately $16,000, based upon an appraisal estimating the total value at $32,480. *See* Debtor's Exhibit No. 2. In addition, the Debtor testified that he is the sole owner of two vacant lots in Big Coppitt Key, Florida, which he purchased in 1988 or 1989 for a total of $26,000. In December 1993, the lots were appraised at a market value of $19,500 and $22,000. *See* Great Southern's Exhibit No. 7. The Debtor's schedules, however, reflect his interest in this Florida real estate at only $20,000. The Debtor testified that he valued these properties lower than the appraisal because he believed that certain assumptions were made in the appraisal, namely that a building permit could be obtained. The Debtor further testi-

fied that his inability to obtain a building permit has thwarted his attempt to market the properties, which he has had listed for sale since 1991. The Debtor admitted that his opinion regarding the value of the properties is based on the inability to obtain a building permit. *See* Transcript of March 22, 1996 hearing p. 25, lines 5–18 (hereinafter "Transcript").

Further, the Debtor testified that he owns fifty percent of the shares of stock of Outback Concessions, Inc., an Illinois corporation ("Outback"). Outback operates a portion of the game concessions for one unit of Windy City Amusements, a carnival operator. The Debtor stated that he did not receive any income from Outback in 1995 and does not expect to receive any income from Outback in 1996 or in the future. The Debtor testified that as of 1995, the value of Outback's assets was approximately $40,000, and Outback had debts of approximately $47,000, and thus, is balance sheet insolvent. *See* Debtor's Exhibit Nos. 3 and 4. The Debtor also testified that Outback had a net loss of $12,000 in 1995. *Id.* Although the Debtor has in past years received income from Outback, due to his physical disability, he is no longer able to perform services for the company, and therefore, no longer receives a salary or any other income from Outback. The Debtor scheduled his shares in Outback at no value given the closely held nature of the business and the current balance sheet insolvency of the company. The Court had no other evidence of current valuations on the various parcels of real estate and personalty involved in this case.

In recent years, the Debtor's financial situation has markedly declined. From an income of approximately $135,000 in 1989, the Debtor's only source of income in 1995 was Social Security disability pay of $10,530. *See* Debtor's Exhibit No. 1. The Debtor suffers from diabetes and "rocker feet." His medical prognosis is not good, nor is he likely to receive earned income in the reasonably foreseeable future. The Debtor stated that his wife receives $1,460 per month from her retirement pension from Ameritech. *See* Debtor's Exhibit No. 5. In addition, his wife receives $230.00 per month from a part-time

job with a dentist. *See* Debtor's Exhibit No. 5.

The Debtor further testified that he leases a 1996 Ford pick-up truck for a lease payment of $271.00 per month. Including his wife's car payment, the Debtor's total budget reflects car payments of $470.00 per month. The Debtor's Schedule J lists total monthly expenses of $1,844.00, and projected income of $2,605.00, leaving disposable income of $761.00 per month, which the Debtor has committed to the Chapter 13 plan. Through the 48 month term of the plan, the Debtor will pay a total of $36,528.00 to the Standing Trustee ($761.00 per month × 48 months). After payment of the Chapter 13 Standing Trustee fee, there will be $33,605.76 ($36,-528.00 − 8% (Trustee fee) or $2,922.24 = $33,605.76) available for distribution to creditors and payment of administrative expenses.

Great Southern has filed an objection to the Debtor's plan. Great Southern claims that the plan was not filed in good faith in violation of 11 U.S.C. § 1325(a)(3) because the schedules are inaccurate and the debt owed to Great Southern is potentially nondischargeable in a Chapter 7 case. Further, Great Southern contends that the Debtor has not committed all of his assets to the plan in violation of 11 U.S.C. §§ 1325(a)(3) and 1325(a)(4). Additionally, Great Southern contends that the plan's failure to acknowledge its judgment lien violates 11 U.S.C. §§ 1322(b)(2) and 1325(a)(5).

The Court held a trial on March 22, 1996. The Court afforded the parties an opportunity to file post-trial briefs. Thereafter, the matters were taken under advisement.

### III. *DISCUSSION*

#### A. *Motion to Avoid the Lien*

■ Upon the filing of a bankruptcy petition for relief, an estate is created. 11 U.S.C. §§ 301 and 541. The estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1); *see also In re Kazi*, 985 F.2d 318, 320 (7th Cir.1993). Section 541 has been interpreted to result in a

debtor's entirety property coming into the bankruptcy estate. *See In re Hunter*, 970 F.2d 299, 305 (7th Cir.1992) (collecting cases). Once the property becomes part of the bankruptcy estate, the debtor is allowed to claim as exempt certain property interests. *See* 11 U.S.C. § 522(*l*); Fed. R.Bankr.P. 4003(a).

It is undisputed that Great Southern has a judicial lien as defined by 11 U.S.C. § 101(36).[2] The Debtor seeks to avoid Great Southern's lien on the Property held by the Debtor and his wife in tenancy by the entirety. 11 U.S.C. § 522(f)(1)(A) allows for the avoidance of a judicial lien and provides:

(f)(1) Notwithstanding any waiver of exemptions but subject to paragraph (3), the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is—

(A) a judicial lien, other than a judicial lien that secures a debt.

11 U.S.C. § 522(f)(1)(A). The Debtor seeks to avoid the judicial lien as impairing an exemption.

Section 522 creates two alternative sets of exemptions. Section 522(b)(1) affords debtors the federal exemptions set forth in § 522(d); alternatively, under § 522(b)(2), debtors may choose exemptions provided by their domicile state along with exemptions provided by federal, nonbankruptcy law. The Bankruptcy Code allows individual states to take this choice away from the debtor by "opting out" of the federal exemptions. Illinois enacted legislation "opting out" of the federal exemptions, and thus, Illinois debtors are only permitted to exempt property under state law or federal law other than § 522(d). *See* 735 ILCS 5/12–1201; *see also In re Yonikus*, 996 F.2d 866, 869–70 (7th Cir.1993); *In re Peacock*, 119 B.R. 605, 607 (Bankr.N.D.Ill.1990), *aff'd*, 125 B.R. 526 (N.D.Ill.1991).

The Debtor has claimed two exemptions for his Property held in tenancy by the en-

---

**2.** Section 101(36) provides that "judicial lien" means lien obtained by judgment, levy, seques- tration, or other legal or equitable process or proceeding. 11 U.S.C. § 101(36).

tirety. In his Schedule C, he claimed a homestead exemption of $7,500.00 under 735 ILCS 5/12–901, and that the amount of $120,-000 was exempt under the tenancy by the entireties provision of 750 ILCS 65/22. After a debtor claims property exempt, any party in interest may object to the claimed exemptions. 11 U.S.C. § 522(*l*); Fed.R.Bankr.P. 4003(b); *In re Salzer*, 52 F.3d 708, 711 (7th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1273, 134 L.Ed.2d 219 (1996); *Kazi*, 985 F.2d at 320. Section 522(*l*) provides that "[u]nless a party in interest objects, the property claimed as exempt on such list is exempt." Bankruptcy Rule 4003 affords the trustee and creditors 30 days after the conclusion of the meeting of creditors to object. The Supreme Court has stated that § 522(*l*) and Bankruptcy Rule 4003(b) bar contesting the validity of an exemption after the 30–day period for objecting has expired where no extension has been granted, even though a valid objection could have been made if the party acted promptly. *Taylor v. Freeland & Kronz*, 503 U.S. 638, 642–44, 112 S.Ct. 1644, 1647–49, 118 L.Ed.2d 280 (1992); *see also Kazi*, 985 F.2d at 320; *Salzer*, 52 F.3d at 711.

The Court notes that Great Southern did not object to the Debtor's claimed exemptions in the Property. Thus, under the Code, Rules, and the *Taylor* case, Great Southern cannot now object to the Debtor's claims of exemption, and the inquiry could end at this point. Due to the lack of any bankruptcy case law in the area of Illinois entireties homestead property, however, the Court will further discuss the issues surrounding both the Debtor's motion and Great Southern's objection.

▪ The Bankruptcy Code references the extent of the exemption for property held in tenancy by the entirety. The issue before the Court is whether the Debtor's interest in the Property held in the entireties is "exempt

from process" under Illinois law, so that it qualifies as exempt property under § 522(b)(2)(B). Section 522(b)(2)(B) states that a debtor may exempt from property of the bankruptcy estate:

*any interest in property in which the debtor had,* immediately before the commencement of the case, *an interest as a tenant by the entirety* or joint tenant *to the extent that such interest as a tenant by the entirety* or joint tenant is *exempt from process* under applicable nonbankruptcy law.

11 U.S.C. § 522(b)(2)(B) (emphasis supplied). By limiting the exemption to that property "exempt from process under applicable nonbankruptcy law," § 522(b)(2)(B) clearly intended to limit the Debtor's exemption to those available under applicable local law.

▪ Accordingly, the exemption of the Property held in tenancy by the entirety claimed by the Debtor arises under Illinois law, and to resolve the question, the Court must interpret that law. *See In re Geise*, 992 F.2d 651, 655–56 (7th Cir.1993) (interpreting Wisconsin law regarding personal injury exemption); *In re Paeplow*, 972 F.2d 730, 737 (7th Cir.1992) (interpreting Indiana tenancy by the entireties law for exemption purposes). Applicable Illinois, nonbankruptcy law that applies is 735 ILCS 5/12–112 and 750 ILCS 65/22, which respectively provide in relevant part:

*Any real property held in tenancy by the entirety shall not be liable to be sold upon judgment entered on or after October 1, 1990 against only one of the tenants.* However, any income from such property shall be subject to garnishment as provided in Part 7 of this Article XII, whether judgment has been entered against one or both of the tenants.

735 ILCS 5/12–112 (emphasis supplied).[3]

Nothing in this Act abolishes or prevents the creation and enjoyment of the estate of

---

**3.** Great Southern argues that the 1990 Illinois tenancy by the entirety statute has "unfortunate and unintended side effects." *See generally* Hammond and Otto, *The Illusion of Reform: Illinois Statutory Tenancy by the Entirety*, 78 ILL. B.J. 198 (April 1990) (notes that Illinois statute is unique, making other states' interpretative case law on those other states' statutes inapposite for Illinois statutory construction purposes). It is

not the function of this Court to legislate. It is the task of the Court to construe and apply the statute, not to reconstruct or correct it. *See generally Deans v. O'Donnell*, 692 F.2d 968, 971 (4th Cir.1982) (court asked to interpret 11 U.S.C. § 1325(a)(3)). The Court has a duty to give effect to statutes and fairly construe same. The Court does not question the wisdom of the Illinois legislature in enacting the applicable statute.

tenancy by the entirety with respect to any devise, conveyance, assignment, or other transfer of homestead property maintained as a homestead by both husband and wife during coverture made or executed on or after October 1, 1990.

750 ILCS 65/22.

■ Although the Seventh Circuit has interpreted tenancy by the entirety statutes in another state,[4] the Court is unaware of any decision that has squarely construed the Illinois tenancy by the entirety statute in the bankruptcy context of a debtor's lien avoidance motion under § 522(f)(1)(A). The nearest reported decision is not controlling or on all fours with the motion at bar, although it provides helpful dicta.

The Illinois Appellate Court for the Second District in *E.J. McKernan Co. v. Gregory*, 268 Ill.App.3d 383, 205 Ill.Dec. 763, 643 N.E.2d 1370 (2d Dist.1994), *appeal allowed*, 161 Ill.2d 525, 208 Ill.Dec. 358, 649 N.E.2d 414 (1995), *dismissed with prejudice*, No. 78487 (May 23, 1995), construed the language of the Illinois entireties statute in the context of the potential for a fraudulent transfer claim against a judgment debtor who transferred title in his home from joint tenancy with his spouse to tenancy by the entirety. *McKernan* traced the common law origins of tenancy by the entirety and the recent reintroduction of this mode of ownership by statute. 268 Ill.App.3d at 388, 205 Ill.Dec. at 766, 643 N.E.2d at 1373. The *McKernan* court was faced with the different issue of whether the potential exists for a fraudulent transfer claim against a judgment debtor

who transferred title in his home from joint tenancy with his spouse to tenancy by the entirety. The *McKernan* judgment debtor transferred title to his home from joint tenancy with his wife to tenancy by the entirety with his wife *after* a judgment was entered against him, contrary to the fact pattern of this matter. The creditor in *McKernan* contended that when the defendant reconveyed title to his home from joint tenancy with his wife to tenancy by the entirety with his wife, he committed a fraudulent transfer within the meaning of the Uniform Fraudulent Transfer Act (740 ILCS 160/1 *et seq.*). The *McKernan* court concluded that the defendant's act of reconveying his home was not prohibited by the Uniform Fraudulent Transfer Act. 268 Ill.App.3d at 390, 205 Ill.Dec. at 767–68, 643 N.E.2d at 1374–75. The court stated that because transfer to tenancy by the entirety is authorized by the Illinois statute, it was not fraudulent for the debtor to have transferred his property to tenancy by the entirety. *Id.* The court noted that "[t]here are no limitations or qualifications on the use of the tenancy, other than the real property be held by a married couple during coverture and that the property be the couple's 'homestead'." *Id.* The opinion noted that the Illinois entireties statute operates similar to the Illinois homestead exemption under 735 ILCS 5/12–901 without the latter's monetary limit. The *McKernan* court interpreted the Illinois statute to mean that property held by the entirety may not be attached by the creditors of only one spouse. 268 Ill.App.3d at 391, 205 Ill.Dec. at 768, 643 N.E.2d at 1375.[5]

4. In *Paeplow*, 972 F.2d 730 and *In re Hunter* 970 F.2d 299 (7th Cir.1992), the Seventh Circuit construed the Indiana tenancy by the entirety statute, which is clearly distinct from the Illinois statute. In analyzing the Indiana tenancy by the entirety statute, the Seventh Circuit held that while a debtor's interest in entirety property initially passes into the bankruptcy estate under § 541, the property passes out of the estate if subject to a valid state law exemption and is therefore not subject to administration by a trustee in bankruptcy. *Paeplow*, 972 F.2d at 737. The Court follows the reasoning in *Paeplow*, as far as it goes, to the Illinois entirety statute. The Court is required to determine interests in and liens upon property, in accordance with applicable state law, to the extent same does not conflict with the Bankruptcy Code. *See Butner v. United*

States, 440 U.S. 48, 54–55, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979).

5. Many other courts have interpreted different tenancy by the entirety statutes in a similar way. *Cf. In re Chandler*, 148 B.R. 13 (Bankr.E.D.N.C. 1992) (joint debtors whose primary asset was a residence held in tenancy by entirety under North Carolina law could claim property as exempt as to individual creditors); *Cech v. Maloney (In re Maloney)*, 146 B.R. 168 (Bankr.W.D.Pa. 1992) (under Pennsylvania law, entireties property is immune from process by creditor to satisfy debt owed by only one spouse; creditor of only one spouse cannot acquire by judgment an enforceable lien against entireties property, or title therein by sale or execution); *In re Anderson*, 132 B.R. 657 (Bankr.M.D.Fla.1991) (in Florida, prop-

■ The Court holds that the language of the Illinois statute, "shall not be liable to be sold upon judgment" is akin to property being *partially* "exempt from process" as provided in § 522(b)(2)(B). In its ordinary legal context, the term "process" is all-encompassing. The term is not a defined term in either §§ 101 or 522 of the Bankruptcy Code. Black's Law Dictionary defines "process" as a "mode, method or operation whereby a result is produced...." Black's Law Dictionary, 1205 (rev. 6th ed. 1990). Because under the Illinois statute the Debtor's Property cannot be sold upon Great Southern's judgment, it is exempt from the forced sale process that could be effected by Great Southern or any other judgment creditor of only the Debtor. *But see Gibbons,* 52 B.R. at 868 (in applying § 522(b)(2)(B), the court narrowly concluded that property subject to attachment in Rhode Island is not "exempt from process," and that it therefore does not qualify as exempt property under the Bankruptcy Code). Under Illinois case law, where the right of sale cannot be asserted, the existence of the lien must be denied. *See Rochford v. Laser,* 91 Ill.App.3d 769, 774, 46 Ill. Dec. 943, 948, 414 N.E.2d 1096, 1101 (1st Dist.1980); *Lehman v. Cottrell,* 298 Ill.App. 434, 441, 19 N.E.2d 111 (2d Dist.1939).

■ Great Southern argues that because the Illinois entireties statute is not found among the exemptions sections of the Illinois Code of Civil Procedure (735 ILCS 5/12–901 (homestead exemption); 735 ILCS 5/12/–1001 (personal property exemption); 735 ILCS 5/12–1006 (exemption for retirement plans)), the statute cannot be interpreted to qualify entireties property as "exempt from process" for purposes of § 522(b)(2)(B). Courts need not require an entireties statute to be found in a designated exemptions section of state law or explicitly use the word "exempt" in its text as a litmus test before the functional effect of the statute's language is applied or implemented. *See In re McClure,* 175 B.R. 21, 23 (Bankr.N.D.Ill. 1994) (found bankruptcy exemption in Illinois Workers Compensation Act although statute did not employ the words "exemption" or "exempt"). Fairly applying the practical function of the relevant statute is more important than using some bright line test hinging upon the statute's use or non-use of the words "exempt" or "exemption" to determine whether or not a state exemption exists for purposes of § 522(b)(2)(B) in a bankruptcy case. Courts should give "exempt from process" its common meaning in the absence of any legislative indication to the contrary. *See Geise,* 992 F.2d at 658 ("While state courts frequently refer to statutes which prohibit only certain forms of judicial process as 'exemption' statutes, the term 'exemption' 'conventionally connotes protection against all forms of process....' ") (citation omitted).

■ Because Great Southern's lien will remain on the Property if not avoided, it impairs the Debtor's exemptions claimed in the Property. Consequently, the lien is subject to avoidance under § 522(f)(1)(A). In 1994, Congress amended § 522(f) to specifically define when a lien shall be considered to impair an exemption. Section 522(f)(2)(A) provides:

(2)(A) For the purposes of this subsection, a lien shall be considered to impair an exemption to the extent that the sum of—

(i) the lien;

(ii) all other liens on the property; and

erty held in tenancy by the entirety is exempt from process to satisfy the individual obligations of either spouse, but may be reached by a joint creditor of both spouses); *Kiester v. Mizrahi (In re Mizrahi),* 179 B.R. 322 (Bankr.M.D.Fla.1995) (same as *Anderson* ); *H.B. Price, III v. Harris (In re Harris),* 155 B.R. 948 (Bankr.E.D.Va.1993) (under Virginia law, property held as tenants by the entirety is subject to claims of joint creditors of both spouses, but is not subject to claims of individual creditors of either spouse); *Hull v. North Adams Hoosac Sav. Bank (In re Hull),* 169 B.R. 4 (Bankr.D.Mass.1994) (Massachusetts law regarding tenancy by the entirety protects non-debtor spouses' interest in residence from seizure or execution by creditor of debtor spouse); *Finneran v. Associates Fin. Servs. (In re Blair),* 151 B.R. 849 (Bankr.S.D.Ohio 1992) (under Ohio law, property held by the entireties is immune from process by the creditors of either individual tenant, but is susceptible to claims by joint creditors); *In re Gibbons,* 52 B.R. 861 (Bankr.D.R.I. 1985) (in Rhode Island, creditors of one spouse may attach, but may not levy upon the debtor's interest in property held as tenants by the entirety).

(iii) the amount of the exemption that the debtor could claim if there were no liens on the property;

exceeds the value that the debtor's interest in the property would have in the absence of any liens.

11 U.S.C. § 522(f)(2)(A). Great Southern cites this Court's decision in *In re Harrison,* 164 B.R. 611 (Bankr.N.D.Ill.1994) in support of its position that a lien does not attach to homestead estate under Illinois law. In light of the congressional amendments to § 522(f)(2)(A), the Court concludes that the *Harrison* decision is inapposite, as it was decided prior to the amendments. The legislative history to amended § 522(f) shows that Congress intended to change the result obtained in cases like *Harrison* because the former statutory language did not define or spell out how claimed exemptions were "impaired." *See* H.R.Rep. No. 835, 103rd Cong., 2d Sess. (1994) U.S.Code Cong. & Admin.News 1994, p. 3340. The Court holds that under amended § 522(f)(2)(A) Great Southern's lien impairs the Debtor's exemptions claimed in the Property because that lien ($140,441.04), which is the only lien on the Property, and the amount of the exemptions ($120,000 and $7,500) that the Debtor could and did claim if there were no liens on the Property, exceeds the value that the Debtor's interest in the Property would have in the absence of any liens.

 Procedurally, the Court notes that to the extent that Great Southern has alleged that the Debtor's actions in transferring the Property from joint tenancy to tenancy by the entirety constitute a voidable fraudulent transfer, it must file an adversary proceeding. *See* Fed.R.Bankr.P. 7001(1); *see also In re Pence,* 905 F.2d 1107 (7th Cir.1990) (revocation of a confirmation order can only be accomplished through an adversary proceeding); *In re Perkins,* 902 F.2d 1254 (7th Cir.1990) (turnover order entered as a result of turnover proceeding commenced by motion rather than by complaint was vacated).[6] Similarly, Great Southern's

arguments about the nondischargeability of its claim against the Debtor pursuant to 11 U.S.C. § 523(a)(6) requires an adversary proceeding under Bankruptcy Rule 7001(6). Whether the Debtor's 1992 reconveyance of the Property from joint tenancy to tenancy by the entirety constituted a fraudulent or otherwise avoidable transfer is not presently before the Court. The only contested matters currently before the Court are Great Southern's objection to the confirmation of the Debtor's Chapter 13 plan and the Debtor's motion to avoid the lien of Great Southern. Accordingly, the Court will not further address, in this Opinion, the arguments of Great Southern along the lines that the prepetition action of reconveying the Property from joint tenancy to tenancy by the entirety was an act of fraud. That will be determined later in the related adversary proceeding pending before the Court.

### B. *Objection to Confirmation of the Plan*

 Great Southern alleges that the Debtor's plan has been proposed in bad faith in violation of § 1325(a)(3) because he filed the case as a result of his debt to Great Southern. Great Southern contends that the Debtor's transfer of the Property from joint tenancy to tenancy by the entirety was done to hinder, delay, and defraud Great Southern. Further, Great Southern maintains that the transfer is avoidable under § 544, and pursuant to § 1325(a)(4), the value of the Debtor's pre-transfer interest in the Property that is not exempt must be included in the distribution to creditors under the plan. According to Great Southern, because the Debtor's plan does not propose to distribute property at least equal to the value of the Debtor's pre-transfer nonexempt interest in the Property, the plan was filed in bad faith and does not meet the best interests of creditors test of § 1325(a)(4).

 Great Southern has raised two additional grounds for objection which can be summarily addressed: that the plan violates § 1322(b)(2)[7] because it modifies Great

---

6. On April 16, 1996, after this matter came under advisement, Great Southern filed an avoidance action in a separate adversary proceeding.

7. Section 1322(b)(2) provides:
 (b) Subject to subsection (a) and (c) of this section, the plan may—

Southern's rights as against the Property; and that the plan violates § 1325(a)(5)[8] because Great Southern's claim is secured as against the Property and Great Southern has neither accepted the plan, the Debtor's motion seeks to avoid its judgment lien, rather than to retain it to secure its claim, and the plan does not propose to distribute over its term not less than the discounted present value of the amount of the claim or surrender the Property to Great Southern.

■ First, the Court holds that Great Southern's § 1322(b)(2) objection is not well founded and is overruled because it does not hold a "security interest" in the Property as defined by § 101(51).[9] Great Southern holds a non-consensual judgment lien encumbering the Property, not a lien created by an agreement like a mortgage or trust deed. Section 1322(b)(2) provides special protection from Chapter 13 plan cram downs on house mortgage lenders, not judgment lien creditors like Great Southern.

Moreover, as a result of the Court granting the Debtor's lien avoidance motion for the reason previously set forth, Great Southern's claim is no longer secured vis a vis the Property. Rather, its claim is an allowed unsecured claim and the protections afforded allowed secured claims under § 1325(a)(5) do not apply to Great Southern.

■ The Debtor, as plan proponent, has the burden of proof with regard to all elements required for confirmation of the plan under 11 U.S.C. § 1325, including the good faith requirement of § 1325(a)(3). *In re Love*, 957 F.2d 1350, 1355 (7th Cir.1992); *In re Standfield*, 152 B.R. 528, 534 (Bankr. N.D.Ill.1993). The Court must confirm a

filed Chapter 13 plan after parties in interest have been given proper notice, if it meets the six requirements of 11 U.S.C. § 1325(a), including the requirements that "the plan compl[y] with the provisions of [Chapter 13] and with the other applicable provisions of this title" and that the debtor "will be able to make all payments under the plan and to comply with the plan." 11 U.S.C. § 1325(a)(1)–(6); *In re Aberegg*, 961 F.2d 1307, 1308 (7th Cir.1992).

■ Section 1325(a)(3) requires a Chapter 13 plan to be proposed in good faith. 11 U.S.C. § 1325(a)(3). The Seventh Circuit has discussed good faith determinations with regard to Chapter 13 plans in several cases. *See In re Schaitz*, 913 F.2d 452, 453–56 (7th Cir.1990); *In re Smith*, 848 F.2d 813, 816–22 (7th Cir.1988); *Ravenot v. Rimgale (In re Rimgale)*, 669 F.2d 426, 431–33 (7th Cir. 1982). The Seventh Circuit has refused to adopt a specific test or definition of good faith. *Love*, 957 F.2d at 1355. Instead, in evaluating whether a plan is filed in good faith, the bankruptcy court is required to weigh all of the evidence in looking to the "totality of circumstances." *Love*, 957 F.2d at 1355; *Rimgale*, 669 F.2d at 432–33. The good faith determination must be made on a case-by-case basis in reliance on the facts of each case. *Smith*, 848 F.2d at 817; *Rimgale*, 669 F.2d at 431.

■ To guide the bankruptcy court in applying the totality of the circumstances test, the Seventh Circuit has set forth a nonexhaustive list of relevant factors which should be considered in the inquiry. Those factors include: (1) does the proposed plan state the debtor's secured and unsecured

---

(2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims.
11 U.S.C. § 1322(b)(2).

**8.** Section 1325(a)(5) provides:
 (a) Except as provided in subsection (b), the court shall confirm a plan if—
 (5) with respect to each allowed secured claim provided for by the plan—
 (A) the holder of such claim has accepted the plan;

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and
 (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or
 (C) the debtor surrenders the property securing such claim to such holder.
11 U.S.C. § 1325(a)(5).

**9.** Section 101(51) defines security interest as a "lien created by an agreement." 11 U.S.C. § 101(51).

debts accurately? (2) does it state the debtor's expenses accurately? (3) is the percentage of repayment of unsecured claims correct? (4) if there are or have been deficiencies in the plan, do the inaccuracies amount to an attempt to mislead the bankruptcy court? (5) do the proposed payments indicate "a fundamental fairness in dealing with one's creditors?" (6) what was the debtor's motive in seeking Chapter 13 relief? (7) what are the circumstances under which the debt was incurred? (8) is the debt nondischargeable under Chapter 7 as the result of the debtor's pre-filing conduct? and (9) is the debtor's intention to fulfill the terms of the plan? *See Rimgale,* 669 F.2d at 432–33; *Smith,* 848 F.2d at 813–22; *see also In re Belt,* 106 B.R. 553, 565 (Bankr.N.D.Ind.1989). When making a good faith determination, the Court is mindful that "[o]nly where there has been a showing of serious debtor misconduct or abuse should a chapter 13 plan be found lacking in good faith." *Smith,* 848 F.2d at 821 (citation and footnotes omitted).

█ The "fundamental fairness" factor is more appropriately a determination which is reached after a review of all of the other factors involved and is the most compelling of all of the factors. *Schaitz,* 913 F.2d at 453; *Love,* 957 F.2d at 1357. "[T]he focus of the good faith inquiry under ... Section 1325 is often whether the filing is fundamentally fair to creditors, and more generally, is the filing fundamentally fair in a manner that complies with the spirit of the Bankruptcy Code's provisions." *Love,* 957 F.2d at 1357.

In applying these factors to the plan at bar, and taking into account the totality of circumstances, the Court holds that the Debtor has demonstrated good faith in proposing his plan. The Debtor readily admits that he filed this instant case to obtain relief from Great Southern's judgment. The two debts incurred pre-petition arose from the litigation brought by Great Southern. Perhaps like most debtors, at the time of the petition, the Debtor lacked sufficient liquid assets with which to pay the judgment. The

Court will not penalize the Debtor by finding a lack of good faith because of his desire to avail himself of the legitimate protections from his creditors afforded by the Bankruptcy Code. *See generally In re 203 North LaSalle Street Ltd. Partnership,* 190 B.R. 567, 590 (Bankr.N.D.Ill.1995) ("[f]ew bankruptcies, likely, are filed with altruistic intent; every debtor presumably files to obtain some benefit for itself or avoid some harm"), *aff'd,* 195 B.R. 692 (N.D.Ill.1996).

What is crucial is that the Debtor acts in a manner that complies with the letter and spirit of the Bankruptcy Code's provisions. The Court finds that the plan demonstrates a fundamental fairness in dealing with the two pre-petition creditors. Further, the Court finds that the plan accurately states the Debtor's secured and unsecured debts as well as the Debtor's expenses. The percentage of repayment to unsecured creditors is also correct ($33,605.76 ÷ $142,693.84 = 24%).[10] The Debtor has agreed to increase the payment term from 48 to 60 months, which is indicative of an intent by the Debtor to pay as much of his disposable income to his creditors during the maximum allowable term under § 1322(d).

█ Great Southern further contends that the Debtor's schedules are "woefully inaccurate." The failure to accurately state obligations in the schedules and the plan can warrant a finding of bad faith as to the Chapter 13 plan. *See, e.g., Love,* 957 F.2d 1350 (debtor understated the amount of debt in the petition; he was not forthcoming with information about dealings with the IRS; he failed to list three insurance policies; and he understated his income).

█ The Debtor stated in his closing papers that the $16,000 from the IRA account that he mistakenly omitted listing as income in his schedules was a one-time transaction and the proceeds went directly from the Debtor to Hamman & Benn, in partial payment of that claim. Next, with respect to various financial accounts the Debtor closed prior to the filing of the case, the Debtor

---

**10.** The $33,605.76 figure represents the amount available to unsecured creditors after payment of the Chapter 13 Standing Trustee fee. The $142,-

693.84 sum is the total of unsecured claims (Great Southern and Hamman & Benn).

offered an adequate explanation regarding the reasons for the depletion of the accounts. *See* Transcript p. 58, lines 4–14. More importantly, the Statement of Affairs only requires debtors to list accounts closed within one year of filing. Thus, as to those accounts the Debtor closed prior to July 1994, no disclosure was required. The Court holds that these omissions, in and of themselves, do not warrant a finding that the plan was proposed in bad faith.[11]

Next, Great Southern maintains that the nature of the debt owed by the Debtor to it—potentially nondischargeable in a Chapter 7 case—places a heavy burden on the Debtor to establish good faith in the filing of the plan. "[T]he right to discharge an otherwise nondischargeable debt through a Chapter 13 proceeding is a privilege to be granted or denied by the bankruptcy court in the exercise of an informed discretion." *Schaitz*, 913 F.2d at 455–56. Moreover, the potential nondischargeability of Great Southern's claim has not been proven—no such adversary proceeding has yet been filed.[12] Furthermore, the nondischargeable nature of a debt (were the case a Chapter 7 case) is not alone sufficient to prove bad faith in a plan. *Smith*, 848 F.2d at 818. The broader protection of a future Chapter 13 discharge under § 1328(a), in contrast to the narrower scope of a Chapter 7 discharge under § 727, in light of the exceptions to discharge under § 523, is a critical factor as to why some debtors opt for Chapter 13 over Chapter 7. Submitting their disposable income for at least 36 months under § 1325(b) is the quid pro quo for opting for Chapter 13 rather than sheltering future income under § 541(a)(6) as in Chapter 7. The argument of Great Southern that its claim may be nondischargeable under § 523(a)(6) is not outcome determinative. The good faith plan requirements under § 1325(a)(3) are not synonymous with any § 523(a)(6) claim, which is not properly before the Court. The burdens and the inquiries for those sections are not the same.

There are many cases where courts confirmed Chapter 13 plans over a good faith objection when the plan proposes to pay less than 100 percent of claims that may be nondischargeable in a Chapter 7 case. *See, e.g.,* *In re Winthurst*, 97 B.R. 457 (Bankr.C.D.Ill. 1989) (1% plan discharging substantial student loans); *In re Jones*, 31 B.R. 485 (Bankr. N.D.Ill.1983) (public assistance overpayments). There are also as many cases that refuse to confirm plans that compromise claims that are or may be nondischargeable in a Chapter 7 case. *See, e.g., In re Todd*, 65 B.R. 249 (Bankr.N.D.Ill.1986) (creditor received a civil rights judgment under 42

11. Great Southern has questioned the credibility of the Debtor and argues that the District Court, in entering judgment against the Debtor in 1995, did not find him credible. The Debtor's credibility in this matter is for this Court to determine, and the fact that another judge during the course of a trademark infringement case may have found the Debtor's testimony not credible has no bearing on this Court's determination in the pending matter. *See generally In re Excello Press, Inc.*, 90 B.R. 335, 337 (N.D.Ill.1988) ("Deference to the bankruptcy court's findings is especially appropriate when the decision rests upon the credibility of witnesses."). In addition, the only other testimony was that of Troy Irvin, a witness who at one time worked with the Debtor in a business named Custom Images until such time that he fired the Debtor. Irwin's testimony was biased and did not ipso facto reduce the Debtor's credibility. Irvin testified that the Debtor allegedly stole $2,000,000 from him. *See* Transcript, p. 101–02, lines 11–25, 1–10. Irvin admitted, however, that he never attempted to recoup the money; he never reported the theft to the police; and he never filed a lawsuit against

the Debtor. Further, and most important, Irvin admitted that he had no first hand personal knowledge of the Debtor's assets or income in 1995. *See* Transcript, p. 102, lines 12–19. The Debtor's assets and income in 1995 are more relevant for determining the various factors under the good faith analysis and for the question of whether the Debtor's Chapter 13 plan is confirmable. Thus, the Court afforded Irvin's testimony little weight in determining the Debtor's credibility, or the ultimate issue of the confirmability of the plan at bar.

12. Because Great Southern has not filed an adversary proceeding to determine the dischargeability of the debt owed it by the Debtor, the question of whether the Debtor's debt to Great Southern would be excepted from a Chapter 7 discharge is not properly before the Court. Moreover, the Court does not render advisory opinions on matters not yet filed, but rather, decides contested matters on the evidence adduced in light of the controlling statutory provisions and judicial gloss for the particular matter at bar.

U.S.C. § 1983 wherein the debtor was found to have intentionally and willfully violated the creditor's civil rights during an improper arrest and physical beating of the creditor detainee by the debtor police officer); *In re Sanabria,* 52 B.R. 75 (N.D.Ill.1985) (student loans). The Court is of the opinion that the better view, the one most consistent with the construction of the Bankruptcy Code, is that the dischargeability of claims is specifically provided for in other sections of the Bankruptcy Code and should not be an outcome determinative or overriding consideration when making a good faith plan determination for plan confirmation under § 1325(a)(3). *See also* Keith M. Lundin, 2 *Chapter 13 Bankruptcy,* § 5.21 at 5–41 (2d ed.1994 and 1995 Supp.). Nevertheless, the Court has considered this factor—that the debt may be nondischargeable in a Chapter 7 case—in determining whether the instant plan was filed in good faith. This factor, however, standing alone, is not outcome determinative.

■ Additionally, the Debtor's pre-filing conduct giving rise to Great Southern's claim or reconveying the Property into tenancy by entireties does not prevent the Court from finding that the plan was proposed in good faith. "[A] chapter 13 plan could be confirmed despite even the most egregious prefiling conduct, where other factors suggest that the plan nevertheless represents a good faith effort by the debtor to satisfy his creditor's claims." *Smith,* 848 F.2d at 819 (citation omitted). What is more important is the Debtor's submission of disposable income post-petition for 60 months in substantial satisfaction of his creditors' claims.

■ Section 1325(a)(4) allows the Court to confirm a Chapter 13 plan only if the unsecured creditors receive at least as much as they would under a Chapter 7 liquidation. 11 U.S.C. § 1325(a)(4).[13] *See In re Reyes,* 106 B.R. 155, 158 (Bankr.N.D.Ill.1989). Great Southern argues that the value of the Debtor's interest in the Property held in tenancy by the entirety must be included in the best interest analysis. In support of this

proposition, Great Southern cites *In re Digaudio,* 127 B.R. 713 (Bankr.D.Mass.1991). The Court disagrees with Great Southern and holds that the *Digaudio,* case is inapposite to the matter at bar.

In *Digaudio,* an objection to the Chapter 13 plan was lodged on the basis that the dividend to creditors was less than what they would receive in liquidation under Chapter 7 in violation of § 1325(a)(4). The dispute centered around the debtor's claim to an exemption under § 522(b)(2)(B). The debtor owned residential property with his wife as tenants by the entirety. The Massachusetts statute protected tenancy by the entirety property from "seizure" or "execution." 127 B.R. at 713. The bankruptcy court, citing a decision from the Massachusetts Supreme Court, stated that the statute permitted attachment despite its prohibition against "seizure" or "execution." *Id.* at 714. The court held that because the trustee would succeed to the rights of a hypothetical lien creditor, the trustee could assert those same hypothetical rights and powers against the debtor's claim to an exemption. *Id.* Thus, the court held that in making the best interests determination under a Chapter 13 plan, the value of the debtor's interest in tenancy by the entirety property was to be included. *Id.* at 714–15.

The *Digaudio* case is inapposite to the matter at hand because the Massachusetts statute would permit an attachment or lien on the entire property, while the Illinois statute does not contemplate forced sale because of a judgment against only one tenant. *Digaudio* is inapplicable in construing and applying the pertinent Illinois tenancy by the entirety statute in light of relevant Illinois case authority. For the same reasons, the decision in *In re Gibbons,* 52 B.R. 861 (Bankr.D.R.I.1985) is likewise inapposite as based on Rhode Island law, which is different from the Illinois statute at issue.

Further, the Seventh Circuit has stated that if applicable state law shields property from nonjoint creditors, it is exempt from administration by the bankruptcy trustee. *Paeplow,* 972 F.2d at 737. Therefore, the

---

**13.** Section 1325(a)(4) requires that "the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim ... [must be] not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date." 11 U.S.C. § 1325(a)(4).

better view is that the value of the entirety property is not considered in the best interests test. *See generally In re Chandler,* 148 B.R. 13 (Bankr.E.D.N.C.1992). Consequently, the Court holds that the Debtor was correct not to include the value of his interest in the Property in the best interest of creditors analysis for purposes of § 1325(a)(4).

 Turning to the best interest analysis, the Debtor has proposed the following liquidation analysis would apply if the estate was liquidated under Chapter 7:

| PROPERTY | VALUE |
|---|---|
| Sale of Illinois Residential Property<br>(Trustee cannot sell property because held in tenancy by the entirety and non-debtor is not subject to claims of Great Southern or other creditors) | $ 0 |
| Sale of Entire Missouri Property at Appraised Value | $32,480.00 |
| Less Costs of Sale at 8% | ( 2,598.40) |
| Net Proceeds | 29,881.60 |
| Net ½ Joint Interest of Debtor) | 14,940.80 |
| Sale of Florida Property | $20,000.00 |
| Less Costs of Sale at 8% | ( 1,600.00) |
| Net Proceeds | 18,400.00 |
| Sale of Stock Shares—Outback Concessions | 0 |
| Total to Chapter 7 Estate | $33,340.80 |
| Less Maximum Trustee Fee (11 U.S.C. § 326) | ( 4,084.00) [14] |
| Less Estimated Trustee's Attorney's Fees | ( 1,500.00) |
| Total Available to Unsecured Creditors | $27,756.80 |

Absent other current valuation evidence to the contrary, the Court will utilize the Debtor's values. The Debtor has calculated that under his 48 month Chapter 13 plan there will be $33,605.76 available for distribution to creditors and payment of administrative expenses. This figure is more than the unsecured creditors would receive if the Debtor were liquidated under Chapter 7. Thus, the Court holds that the Debtor has demonstrated that the current plan meets the best interests test under § 1325(a)(4).

## IV. *CONCLUSION*

For the foregoing reasons, the Court hereby overrules Great Southern's objection to confirmation of the Debtor's plan. The Court will not confirm the plan, however, given the fact that the Chapter 13 Standing Trustee has not made a recommendation that all confirmation requirements have been met.

Additionally, the Debtor's testimony expressly stated that he will increase the term of his plan to 60 months. This warrants granting the Debtor 14 days leave to file and serve an amended plan. Thereafter, the Court will hold a continued confirmation hearing on June 14, 1996 at 11:30 a.m. in Courtroom 2000, 505 North County Farm Road, Wheaton, Illinois, on such amended plan. Further, the Court grants the motion of the Debtor to avoid the judicial lien of Great Southern. Great Southern's lien is avoided pursuant to § 522(f)(1)(A).

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

14. Pursuant to § 326, the calculation is as follows: 25% of first $5,000 or $1,250; 10% of balance $28,340.00 or $2834.00 ($1,250.00 + $2,834.00 = $4,084.00).